Case number 13-1138 at L. Aera Energy LLC at L Petitioners v. Federal Energy Regulatory Commission Mr. Moriarty for Petitioner Kern River Gas Transmission Company Ms. Edwards for Petitioners Aera Energy LLC at L and Ms. Perry for Respondent Mr. Moriarty, we will wait for the courtroom to clear. Thank you. Okay. Good morning. Good morning. May it please the Court, my name is James Moriarty, here on behalf of the appellant, Kern River Gas Transmission Company. The appeal concerns a complex rate case which was filed by Kern River at the Federal Energy Regulatory Commission in 2004. We'd be very grateful if you simplified it. Yes, I will, Your Honor. We raise two issues. The first is, when did the FERC fix the rate under Section 5 of the Natural Gas Act? If you agree with us that electrical district controls... What about Transwestern? And if you don't agree with us, then go with Transwestern. Transwestern allowed the Commission to fix a rate without having a specific rate actually stated. Just a formula? Just a formula. Why isn't this case a fortiori to that? Because, Your Honor, our rate... Because in this case, we don't have a formula. We just have one factor that is added to it. The Commission says change that one factor, and everybody has the model, and they can do it. It's just a mathematical calculation. Correct, but that's not... Why isn't that a fortiori to Transwestern? Because that's not what happened here, Your Honor. This is a case that started in 2004. No, no. Just go specifically to the mathematical calculation. Right. We were told... Isn't that correct? No, Your... Well, not for our case, Your Honor. We were told in 2004, and I'm sorry, in 2010, to change one element of this rate case that had been in place for six years. Go ahead. Okay, so we went back, and we had to change what were the billing determinants that were incorporated into the rates for four different classes of customers. The expansion ship... Counsel, it's still just one number, isn't it? It was one number, Your Honor. It took us 45 days to recalculate the rates for all the individual shippers. We filed that with the FERC, and it took the FERC 10 months to approve our compliance filing, which stated those actual rates. But the model that you used was given to all the shippers. Your Honor, it was available to them, and anybody, I guess, could have tried to do that, but none did. But this was just a... In other words, this is a complicated mathematical task, but it's easily... I mean, it's calculable. It is calculable, Your Honor. Why did it take you 10 months? You can't find people who can calculate like that? It didn't, Your Honor. It took us 45 days. It took the commission 10 months. Well, FERC is slow. But why did it take you 45 days? Well, Your Honor, once we file a rate, you know the file rate doctrine controls, so we have to make sure that it's the correct rate that we charge all the individual shippers on our system. So it is not as simple as saying, if this happens, the rate is 10, and if this happens, the rate is 8, like in the Transwestern case where there are only three shippers. But it's definable. Yes, sir. It is definable. It just is a complicated process. And it wasn't a stated rate until the compliance filing was actually accepted by the FERC. So that's the simple version of the first issue. The second issue has to do with whether the FERC, the Federal Injury Regulatory Commission, violated the Administrative Procedure Act by failing to address an issue that Kern River raised. That issue had to do with the rolled-in rate credits that occurred because shippers were moving from Period 1 rates to Period 2 rates. The commission ultimately determined that because of that transition of those shippers from Period 1 to Period 2, that there should be a rolled-in rate credit in Period 2. What Kern River had been arguing is for the very same reasons there should have been a rate credit in Period 1. The commission did not address Kern River's arguments when those were raised. It was only two years later, when Kern River again raised those issues, that the commission said that the Period 1 rates had been established. It didn't provide any rationales to how they had been established. It was only then later, a year later, in another re-hearing decision, that they again denied Kern River's arguments. We heard for the first time on the appeal here in the briefs that the reason that Kern River's arguments were rejected is because we should have sought re-hearing of 486D three or four years ago, because that's when the commission found that our arguments as to Period 1 were rejected. Our position is we were not given that guidance at any time until these briefs were filed. That is post hoc rationalization and cannot be accepted by this court as a reason for a federal agency action. And that's Issue 2. Thank you very much. Thank you. May it please the court, I'm Catherine Edwards here on behalf of the Kern River customers. We are shippers, producers, electrical generators, and we use the Kern River pipeline to transport supply to California markets. We will all qualify for Period 2 rates beginning in, for my customers, beginning in 2016. So that is the basis of our interest in the design of these Period 2 rates. What we're going to try to convince you all today is that you should not defer to FERC's failure to adjust the rate of return on equity in Kern River's Period 2 rates. Can I ask you a couple questions? Preliminary, I was a little confused. Why do you necessarily assume that the cost of equity is less than the cost of debt or vice versa? Doesn't it vary depending on economic conditions? Sometimes debt is more expensive than equity. Sometimes equity is more expensive than debt. Your Honor, I'm certainly not a financial expert, and I can't give a very sophisticated answer to that question. But in this case, the debt equity component was mandated by the rate design. So in Period 1, the rates were assumed to have 70% debt, which was assumed to be equivalent to 70% of the initial investment, and 30% equity would be the difference. Yeah, I did understand. Another question I have, I'm a little confused as to the interconnection between levelized rate and the equity-debt relationship. I didn't quite understand that in the briefs. The levelized rate is really an independent question of the debt equity component in this sense. That's what I thought, yet in the briefs it was connected, and I couldn't figure out what the connection was. No, no, sir. We didn't intend to.  Yeah, not in our brief. No, the levelized rate goes to the fact that as depreciation decreases over time, instead of reducing the rate. I understand how the levelized rate works, but I couldn't figure out what the connection was between the levelized rate and the debt equity relationship. We believe there is none. Well, that helps. In the levelized rates in Period 1, it's based on a debt equity ratio of 70-30. In the levelized rates in Period 2, it's based on 100% equity in the capital structure. Wait a minute. Levelized rates are based on the equity? No, they're levelized rates. Levelized rates deal with the cost basis, right? Exactly. What's that got to do with the – what you're saying is the cost of equity is part of the cost of the rate. It goes into the rate base. Exactly. Yes, but I don't see what the connection is. Oh, well, perhaps you can explain it. Go ahead. The levelized rates – the exercise of levelizing the rate is independent of the capital structure that's embedded in the levelized rate. Okay. So this, that we see before us today, this rate system, could have occurred without regard to what the debt equity ratio was? Yes, yes, Your Honor. Explain more. Yes, Your Honor. The original orders defined what the debt equity ratio was, but the levelization aspect is independent of what that – So if the definition had been 90-10 instead of 70-30, you still could have come up with the same rate, same levelized rate? The rate would have been different, but it would have been levelized over a set period of time. I see. All else being equal. The rate would be different depending on the cost of capital. That's exactly right. But the process of levelizing would be the same in both cases. The process of levelizing would be the same. Exactly. It would come out with a different result depending upon the debt equity ratio. That's exactly right. Yes. That's exactly right. So the legal issue really at play is the principle that as the equity component in a capital structure increases, debt is retired, risk is reduced, and therefore the return on equity that's applied to that equity component, the rate of return on equity, which we're calling the ROE, should be reduced accordingly. This principle was described in the Missouri Public Service Commission case as a common sense principle. Excuse me. FERC's response to that is, well, the financial risk may be different, but there's a business risk that offsets. That's exactly what FERC's argument is. That's their primary argument. It's what I call the offset argument. FERC's argument is they speculated that in period two, there's no evidence to this effect, they speculated that in period two, beginning in 2011, that there will be increased business risk on Kern River because of the contracts that expire in period one. I.e. that competitors will get into the market. Potentially, or the market will change in some way. Yeah. That's the speculation. And that that increase in business risk will offset what nobody can test, will be a decrease in financial risk associated with the 100% equity capital structure. Now, there is a statement in at least one of the briefs that this pipeline is unique in being 100% equity. Is that correct? I don't certainly think bonds exist on pipelines, but this is the only one that FERC is regulating that has that. It is the only one we are aware of. Yes, Your Honor. And we cited at page 31, I believe, of our initial brief, various cases that describe equity components in the ranges of 80 and 90% as being anomalous, so that clearly 100% equity is anomalous, and we're not aware of any other pipeline in the country that. . . It's more than anomalous. It might be unique. We believe it is, Your Honor. Yes. But this was part of the original deal, wasn't it? Yes, and we're not complaining about 100% equity. What we're arguing here, based on this legal principle in the Missouri Public Service Commission case, is because of this anomalously high equity, then the ROE must be reduced below the median, which was the 11.55%. And FERC's answer to that is that, no, there's this manufactured increased business risk that offsets the decreased financial risk. But the problem with FERC's argument is that it's undermined by other statements in the record. FERC itself has said that in 486B, that's at paragraph 148, at JA658, FERC found that Kern River's competitive position will be enhanced, improved, over what it was in period one. So FERC can't have it both ways. Wait a minute. And what opinion did they say that in? At what date? Your Honor, it was 486B. What date? Paragraph 148. It was January 15th, 2009. Furthermore, FERC relied on standards and force reports. It said that FERC... No, go back away from that just quite yet. Give me the page number in that 468. Yes, Your Honor. It's opinion 486B at paragraph 148, JA site is 658. FERC also relied on standards and force. There's standard and force report that came out in 2010. And in that report, standard and force, which is supposed to represent the views of the investor community, said that Kern River's prospects are more favorable. And this is even at 2010, which is the eve of when the 2011 period two is supposed to begin. And then a third problem with FERC's theory that the business risk will increase because of the contract expirations is that FERC itself, in its orders, has said that the fact that contracts expire does not distinguish Kern River from any other pipeline in the natural gas industry. And that site is at 486E. That was with respect to volume, right? Two. Volume. That was with respect to volume. No, Your Honor. That's what FERC was addressing when they said that, right? Yes, it was addressing the billing determinant volume issue. Right, which is volume, yes. But the point is the same. I understand your point, but that's what they were doing. Yes, yes, it was in the context of addressing volume, billing determinants. Yes, sir. So the problem here is we've got FERC speculating about a risk that's going to occur 2011 and afterwards, and its speculations are completely undermined by statements in its orders that are contradictory. That's the classic case of unreasoned decision-making and requires a remand, in our view. There are many other examples of inconsistencies, and I can go on. They all relate to this offset argument. Another example is where FERC talks about what a 2004 investor would expect would occur in 2011. And at one point, FERC says that, and its argument depends on the fact, that a 2004 investor would appreciate that there would be additional risk in 2011 and onward. And then in another part of its orders, it says the 2004 investor would believe that the competitive risk, because of Current River's success over the years in getting expansions and contract renewals, was not particularly threatening. And yet, in a third part of its order, two paragraphs prior to the one I just referred to, FERC determined that the details of the higher risk environment in 2011 would unlikely have been visible to even the most discerning investor. So FERC is all over the lot as to what a 2004 investor might think is going to happen in 2011. And the only objective evidence we have in the record as to what the investment community thought about the risk is, in fact, the Standard and Poor's report, which demonstrates that Current River's prospects are more favorable than negative. So the merits of the assumption that there will be increased risk in 2011 and forward are completely contradicted by various statements in the record. Am I out of time already? There are four other arguments FERC makes. We've addressed them all in our briefs. I'm happy to answer any other questions that you might have. And I've saved a couple minutes for rebuttal. Thank you. Thank you. May it please the Court, Lona Perry for the Commission. I would like to begin, if it's okay, with the return on equity issue that we just ended with. I'd like to start with discussing the 100% equity structure and why it is that the Commission did not apply its standard policy with respect to 100% equity structures in this case. And it's actually best explained by the Commission in the discussion in 486D, the petitioner was referring to just now. It's paragraphs 159 to 162 in your joint appendix at 911 to 913. And there the Commission explains that in traditional rate making, there's a snapshot in time. The capital structure and the rate base are of a particular moment in time and that they continue to apply for the rates throughout the life of the pipeline until it files another Section 4 case. In this case, this is a very unique capital structure because it was reached by agreement. And it was an overall just and reasonable rate structure. It began with a 70-30 debt equity ratio. And it was just structured to say that the debt was recovered over the course of the first levelized period and then only the equity remained. But the significant factors are, first of all, that it started with 70-30 debt equity and then it went to 100. But the second important point you have to bear in mind about this particular capital structure is that the rate base continually declines. Unlike traditional rate making, if you had a 100% equity structure, the rate base would continue the same throughout. But in this case, the rate base continually declines, which the Commission held helps to assure that there wouldn't be an over-recovery with the 100% equity structure, unlike under traditional rate making. And that's why... Why does the rate base decline? Because that's how... This is a unique structure and it was set up that way specifically in order to make sure that there wouldn't be excessive recovery. You mean because of the levelized... Because of the levelized rates, Your Honor. And it was part of making sure that there wouldn't be excess recovery during the 100% equity phase. And this is also discussed at 486E, paragraph 62, JA2702, paragraph 154 and 55, JA2745 and 46, and 486F, paragraph 213, the Joint Appendix at 3765. See, the Commission was making the point that because of this declining rate base and because of this overall structure, that this was a just and reasonable rate. It was simply not comparable to the 100% equity structures that they were talking about in the cases that Petitioner relies on in their brief. And as a matter of fact, in note 202 and JA912, the Commission distinguishes that precedent from this equity structure. That's true. What about the argument that you're inconsistent? The specific arguments that counsel just made. There is no inconsistency, Your Honor. I'll begin, first of all, with the last one that she was talking about, where she is making reference to, in the period two case, Kern River was arguing that its return on equity should go up because of the risks in recontracting while the shippers were arguing it should go down. And in that argument, the testimony that they presented in support of that argument had to do with events that occurred in 2010 and 2011, which is the advent of the Ruby Pipeline, which provided new shipping to California, and the Rocky's Express Pipeline, which provided shipping to the east, which provided takeaway capacity and competition with Kern River. And the Commission said, in the parts that she is referring to, the Commission rejected that evidence because it was not in the 2004 test period. The issue is, what would somebody in 2004 perceive? And so the Commission rejected that. And this is at paragraphs 486F, 249, and 250, Joint Appendix 3776 and 377. Excuse me, counsel. I think the thing that's puzzling is she said that the contention that the business risk offset the financial risk in period two, as anticipated back in 2004, is inconsistent with the way you treated the case in other respects and inconsistent with the way you treat other cases. Isn't that what I understood her argument to be? That's her argument, Your Honor, but I'm trying to explain why that's not the case. I mean, in this particular case, with regard to the 2010 evidence that they rejected, the Commission specifically said, in those same paragraphs I just cited, that a 2004 investor would have anticipated that there would be competition because there were high basis differentials in 2004 that would incent somebody to compete with the only thing. It's one thing for you to say we're not going to allow evidence to come in on that now because it's too late, but it's quite different for you to say in 2004 investors would have anticipated this situation. That's exactly right. Aye, sir. The Commission was saying an investor in 2004 would not have anticipated these particular pipelines that came along, but they would have anticipated that somebody would come along because those high basis differentials were very attractive to competition. And so they wouldn't have had the specific evidence that Carn River was trying to put in in support of its 13% return on equity, but they would have anticipated that there would be competition. And that was the reason why the Commission found that there was business risk. I mean, obviously, there is business risk inherent in the nature of the turning over to the Period 2 because every single Period 1 contract is expiring. I mean, they have patent recontracting risk, and the only question is what other options will shippers have at that time? What competition will be there? What other things could they do? But every Period 1 contract is expiring, so there's inherent recontracting risk. This may have been in your answer, but I didn't get it. Does the fact the unique structure of having 100% equity change anything in what you just said about business risk? Or is the business risk the same as it would be if it were, say, a 70-30 risk? It definitely affects the financial risk, Your Honor, and the Commission acknowledged that it lowers the financial risk. No, Counsel, can I just ask whether it affected the business risk? Yes. Well, no, the business risk, it wouldn't affect the business risk. It would not affect the business risk. It just lowers the financial risk. I don't think Counsel can be saying the FERC was relying on changing the business risk. Did I misunderstand her, or was she wrong? Well, the Commission is relying on a change in the business risk for Period 2 because of the expiring contracts. But you're not asserting that the business risk is any different than it would be without the unique capital structure? Well, no, Your Honor. With respect to the recontracting risk, that's a function of all of the Period 1 contracts expiring. And the fact that it's attractive for competitive purposes to other pipelines. So I don't see a direct link there. With regard to the statements in 486B, 486B was looking at the return on equity in terms of 2004 itself. It's not Period 2, it's Period 1. And in 2004 itself, I mean, Kern River was fully subscribed. And that's the analysis of risk that was going on. And they made reference to the fact that the prices would go down for Period 2 contracts. And that is true. I mean, as between Period 1 contracts and Period 2, the Period 2 rates are lower. But the Commission was looking in terms of business risk at the competition, the pipeline competition that would be coming online, and the other options that shippers would have, other than simply renewing their contract on Kern River. But essentially, that was the discussion for the risk in 2004 and the return on equity for the Period 1 rates, not for the Period 2 rates. What about Kern River's argument? With regard to the first argument, the Commission found that in terms of the fixing the rates in 486— Why did it take FERC 10 months to accept the compliance filing if it was just a number put in the model that changed? Because, Your Honor, what FERC did in 486D, which is what came out 10 months later, was it addressed numerous issues about the scope of the hearing on Period 2. It didn't—all it did was accept, in paragraph 100 of 486D, it accepted the compliance filing with the corrected numbers. What took so long was all of the effort that went into confining and defining the scope of the Period 2 hearing. And that's why—but the Commission wasn't concerned about that because it had already fixed the rate as of 486C. So it didn't feel that there was a need, because the rate had already been fixed for Period 1, that there was a need to address that hastily without addressing the rest of the issues that they wanted to cover on the Period 2 hearing. I see. And with regard to the rolled-in rate credits, that was the initial decision in the Period 2 hearing rejected. Colonel Rivers' arguments on the period—attempting to adjust the Period 1 rates— Would you explain the rolled-in credits, please? Yes, Your Honor. It is— That's because of new shippers coming in? What it is, Your Honor, is there was the original system that started in 92, and then in 2002 there was an expansion. And that expansion, because it would lower the rates for everybody, they were allowed to roll in— By an expansion. You're talking about expansion of the pipeline or expansion of the number of shippers? Expansion of the pipeline. It was that they added compression to the pipeline. That wasn't clear. Okay. But that's only done when you have new customers, right? That's right, Your Honor. So you had expansion of the shippers, too? That's right, Your Honor. There were 2002 expansion shippers. And because it lowered the rates of the original shippers, if you rolled them all in together, the Commission allowed for rolled-in rates. So they combined the original system and the expansion system rates together. So the original shippers got the benefit? That's right, Your Honor. But because they had different contract durations, they couldn't literally roll them all in together. And so they came up with this mechanism whereby they would calculate a credit to the original shippers' rates, which would reflect the benefit to them of those 2002 shippers coming in. And so that's the issue. What is the issue? Well, the issue is they have a rate credit, and the problem arises… Who's they? Who's they? I'm sorry. There's a rate credit to the original shippers that reflects this benefit. Okay. And it's the benefit that they get from the 2002 expansion shippers joining. Got that. Now what? So the issue arises because there are a 2002 expansion shipper that steps down to period 2 rates, which means his rates go down, when there are still 15-year original shippers paying period 1 rates. And so what Kern River wanted to do is to go back and adjust those 15-year original shippers' period 1 rates to account for the lower benefit that they were getting from the 2002 expansion shipper that had stepped down to lower period 2 rates. Why would Kern River… That sounds like Kern River wanted to reduce the rates for some people. No, that can't be. It actually increased… It would increase the original shippers' rates because their benefit would go down. Because what? Their benefit from the expansion shippers would go down. Okay, gotcha. Because there's no way Kern River would want to reduce the rates. They always want to increase the rates. Right, Your Honor. And they wanted to increase the shippers' period 1 rates. I got it. I got it. And so what's FERC's answer to that, or what's Kern River's position, and what's your answer? Kern River's position is that even though they never asked for any adjustment to the period 1 rates while the period 1 hearing was going on, that they should have been able to reopen the record in the period 2 hearing and raise it there. And the ALJ said you can't do that. The period 1 rates were finished as of 486D. It's not part of this proceeding. And the commission affirmed the ALJ in 486E and denied rehearing in 486F and also stated in those opinions that period 1 rates were final as of 486D and that the hearing that was set on period 2 rates was only for period 2 rates, that it didn't include any period 1 rate issues. And so it simply was they should have raised it in the period 1 proceeding, and they didn't. And therefore, they were not allowed to make that adjustment. The commission did make the adjustment for the period 2 rates that they asked for in the period 2 rate hearing, but they did not allow the adjustment for the already finalized period 1 rates. If there are no further questions, thank you. Thank you. Ah, okay. Thank you. I won't take much time. I'd like to go back to Judge Silberman, that Kern River always wants to make sure that it's charging just and reasonable rates. And if there are credits in one, it'll increase elsewhere. I also would like to say that Kern River does support most of what the commission has done here over these eight opinions. It was a very difficult, time-consuming, challenging series of proceedings, and Kern River much appreciates what the commission had to go through. We only raised two very narrow issues. One is that under Section 5 of the Natural Gas Act, when do you fix a rate? And Judge Silberman had raised earlier in the earlier argument about then-Judge Scalia, who said in the electrical district case that you can't fix what you don't see. And here there was no rate to see in order for- But Judge Williams in Trans-Western seemed to take a somewhat different position, less formalistic. Well, I think what he found there, Your Honor, is that if there were only three shippers, and the three shippers were responsible for 100% of the cost, and one of those shippers backed out, that the other two then would be responsible for 100% of the cost. A rather straightforward formula. Well, it was a formula, right? It was a formula, Your Honor. And most rates are a formula. I mean, you plug in the data inputs and you come out with what the rates are. And on the last issue, I just would like to say that Kern River was not given notice by the commission that the Period 1 rates were locked in and took the language in D, 486D, about addressing issues in the transition from Period 1 to Period 2, as indicating that those issues could be raised, which they were, and ended up in benefits flowing to the Period 2 shippers. Was that what you think was ambiguous? Your Honor, I guess now with the post hoc rationalization that's been provided, it's clear. But at the time, it was not clear. It was ambiguous. It was ambiguous, Your Honor. So are they entitled to deference as to their interpretation of their own rules? Your Honor, when it's stated, yes. When it's not stated, no. Okay. Thank you very much. Thank you. You had no time left, but we'll give you two minutes. Oh, thank you. Thank you. I've got three very quick points. First point, Counsel Fulfer did not address the basic inconsistencies. You asked Judge Silberman. She never responded and explained why the language in 486B that Kearns risks are enhanced, I'm sorry, are reduced in Period 2 because of the lower rates. She never addressed that inconsistency with the argument that she's making. Point one. Point two, Judge Suntell. Here we go again. You're getting used to this, right, this morning? In response to your question, also, that was not answered by counsel for FERC, as to the relationship between the 100% equity capital structure and business risk, again, I refer to that very same paragraph in 486B, 148, and if I just may read quickly into the record. As the reduced Phase 2 rates become effective, Kern River's competitive position should be enhanced and its equity risk will decline significantly. This will further improve its competitive position regarding firms already in the market. So, clearly, the 100% equity does have an impact on reducing business risk. At least FERC said so. And then the final point I would like to leave you with is that these orders are rife with inconsistencies, as we pointed out in the brief. If FERC's orders are affirmed on this record, it would render meaningless the legal principle I issue here, which is that the higher the equity component, the ROE should be reduced. Because we can't conceive of any case with facts any more compelling than this case, where everything else is the same and the only thing that changes is the 100% equity capital structure that reduces risk. We can't conceive of any facts that would require a reduction in the ROE if this case does not. It would just write that legal principle out of the law. So that's all we have. Can I ask the government to come back and respond to those points? Would that be all right? Sure. Yeah. Thank you. I'd like to ask the government to come back and answer those specific points. She says you didn't respond to her two points, two inconsistencies, and I didn't think you did either. Did you? I thought I did. Well, what about her specific points? The point that she was just raising was that the only thing that changed here was the— Not the last point. The first two points. You listened carefully, didn't you? I did, but now I was focusing on the last one, and now the first two have escaped me. You know, if you get confused in this case, what hope do we have? Well, the first one was 486B. Yes, the point that you were inconsistent in talking about business risk. That is correct. That in one opinion you said you would actually not have a business risk, you—Curran River would not have a business risk in the Phase II period because they were a hot item or something like that. Did you say that, and is that not inconsistent with saying there is a greater business risk that offsets the financial risk? It's not at all inconsistent, Your Honor. All they were saying in this— Who's they? I'm sorry, the Commission. All the Commission was saying in 486B, and this is Paragraph 148 that she's referring to in the Joint Appendix 658, all they were talking—well, first of all, again, they were talking about Period I, return on equity, not Period II, return on equity. This is Period I we're talking about. And they were saying—the only point they were making is the rates are going to go down in Period II as opposed to Period I. No, we're talking about business risk. And that's a good thing. We're talking about business risk. If I understood counsel, at one point FERC indicated there would be no business risk in Phase II, and at another point they said there is a business risk. Is that correct or not correct? No, but, Your Honor, I'll read you the sentence that she's relying on. What it says is, as the reduced Phase II rates become effective, Kern River's competitive position should be enhanced and its equity risk will decline significantly. So if its competitive risk is enhanced, that's not an increased business risk. Right. The equity risk declining significantly goes to the financial risk. Well, counsel, just stop for a moment. If at one point FERC said Kern River's business risk would be less, and at another point it says it would be greater, that's inconsistent, isn't it? No, Your Honor, because all they're saying here is that the rates will go down in Period II, and that's a good thing for their competitive position. But that has nothing to do with the… With business risk? For business risk, for the recontracting risk, right. Wait, it has nothing to do with the rates are going to go down, so there will be a reduced business risk? What I'm saying, Your Honor, is what the commission was saying is the fact that the Period II rates will go down is a good thing for their competitive position. But that doesn't mean that there won't be pipeline competition that will come in. An improved competitive position would seem to coexist with a reduction in business risk, wouldn't it, rather than an enhancement of business risk? Right, Your Honor, but what they're talking about is the fact that the Period II rates are going to go down. And certainly everybody would agree that for that purpose, that's a benefit. That's not ending our confusion. Whatever the cause, if your competitive position improves, does that not mean that you have had a reduction in business risk rather than an enhancement of business risk? No, Your Honor, what I'm trying to say is what they were saying there is that the fact that the rates will go down is good for their competitive position, but that doesn't speak at all to the pipeline competition and what other options shippers might have. That doesn't make sense. An improvement in their competitive position doesn't speak to competition from other pipelines? That doesn't help my confusion very much, counsel, when you say that. Well, it's clearly the lower rate makes it more likely that those shippers will roll over to the Period II contracts, but it doesn't say anything about what other options they may have as a result of other pipelines. Well, that doesn't mean it hasn't said something about business risk. You keep telling us it doesn't say anything about what other options they might have. Maybe it doesn't, but it isn't designed to be viable for the entire business risk world. It is saying they're in a better competitive position. So why isn't that a reduction in business risk? It is a reduction in business risk insofar as the lower rates is a benefit to them. But I would also point out, Your Honor, again, we are talking about 486B. This was the analysis that the Commission was doing of the return on equity for the Period I rates. Now, the parts that I have been citing to you, 486E and 486F, that was the Commission's analysis of the return on equity for the Period II rates. The analysis that was undertaken was different. The return on equity for the Period I rates only had to do with investor perception of risk of Kern River in 2004, whereas the Period II rates, it was investor perception of risk much further into the future. And it was a different analysis that the Commission was undertaking. So the analysis of the return on equity in Period II is what the Commission undertook in 486E and 486F, in which it consistently found that given the high basis differentials in 2004, an investor in 2004 would have anticipated pipeline competition that would have caused competitive issues for Kern River. What about her second point, before you ever get to the third point? Do you remember what the second point was, where she claimed you were inconsistent? I don't, Your Honor. What was it, Counsel? Your Honor, it was in response to Judge Santel's argument, the relationship between 100% equity capital structure and the impact that that would have on reducing business risk. And I cited this very same paragraph in 436B. Isn't that your third point? No, my third point was this case is affirmed. No, no, okay. And you've been writing out the original. Okay, now what about the second point? The 100% equity certainly lowers financial risk, and so it's overall a benefit to the pipeline. But I don't know that the commission made a connection between lowering, I mean, you know, lowering its financial risk in general improves its competitive position. Let me ask this question. If Burke found there was a lowering of the financial risk in period two and didn't discuss at all competitive position, wouldn't that necessarily require a reduction in return on equity? It certainly would come much closer to that, Your Honor. I mean, it always is. Wait a minute. Wait a minute, Counsel. What do you mean? I'm afraid this is a box. Is it not? If you eliminate competitive risk entirely and the only thing you have is a 100% equity situation, under the precedent, Counsel argues, you would have to reduce the ROE. Your Honor, I explained, I hope, why that precedent doesn't apply to this levelized rate. The commission has already explained why their precedent that they lower ROE is because of the 100% equity. So, in other words, your position, you win even if there's no competitive factor at all? Not necessarily, Your Honor. Wait a minute. Wait a minute. You can't do that. I'm isolating the competitive factor, taking it out, right? Now, the question is if, in fact, the evidence is that Kern River's competitive position is even better in period two, do you not have to, in accordance with your precedent, reduce the ROE? Why? Because you're dealing with 100% equity. Yea or nay? I know that you want me to say that you would have to reduce the equity. No, I don't want you to say anything but the truth. But the thing is you have to bear in mind is this isn't an inquiry. You don't make gradations of whether in the range of reasonableness. It's a broad range of reasonableness, and it's only in very anomalous circumstances that you go either up or down from the median. And I'm simply not prepared to say that because of this special structure, because this isn't your typical 100% equity case, I'm just not prepared to say that it would be such an anomalous circumstance that it would justify deviating from the median, even under those circumstances. Because this isn't your usual 100% equity case. Is there a usual 100% equity case? It's all the cases that counsel cited to you. The cases where under traditional rate making somebody comes in with a very high equity structure and the commission imposes a hypothetical structure in its place. So it's not the case that this is unique to having a 100% equity structure? No, Your Honor. There are certainly pipelines that have extremely high equity structures. That's not exactly what I asked you. Oh, yes. I was told a while ago that it was unique in having a 100% equity structure. You are now saying that there are other companies that have a high equity structure. Is it unique in having a 100% equity structure? Or not? Or I don't know. We'll take I don't know for an answer. I don't know about 100%. But certainly a number of the cases that were cited by Petitioner's counsel was 90%. That's not what I asked you. I asked you a yes or no question. To your knowledge, is it unique in having a 100% equity structure? Is it yes, no, or I don't know? Don't tell me anything else. You can explain after you say that. But say one of those answers first. The only 100% equity structures I'm aware of are other pipelines that have levelized rates. Is that a yes or no to my question? Does that mean that yes, there are others that have 100% equity structures? Yes, I believe so, Your Honor. I mean, I believe that Baha'i Pipeline, which was approved at the same time, had the same structure. They ultimately went over to traditional rates. But they started out with this same levelized rate structure. Anything further? Thank you. Thank you.
judges: Brown, Silberman, Sentelle